STATE OF NORTH CAROLINA v. DENNIS LOMBARDO

No. 130A81

(Filed 5 October 1982)

1. **Arrest and Bail § 3.4; Criminal Law § 84— motion to suppress—initial seizure of defendant challenged—"fruit of the poisonous tree" doctrine—reliance on presumption of regularity of search warrant erroneous**

Where defendant made a timely objection to the validity of a search warrant on the basis that the initial seizure of defendant at an airport was unconstitutional and that the "fruit of the poisonous tree" doctrine applied to suppress evidence obtained under the warrant, the Court of Appeals erred in relying on the presumption of regularity of search warrants not introduced into evidence in holding the defendant's motion to suppress should have been denied.

2. **Criminal Law § 143.5— probation revocation hearing—inapplicability of exclusionary rule**

Because the exclusionary rule is built on the notion that evidence derived from searches and seizures is oftentimes the foundation upon which a conviction will rest and the strength of the State's case will be measured by the caliber of such evidence admissible at *trial*, extending the application of the exclusionary rule to *probation revocation hearings* will add nothing to its deterrent effect so long as the enforcement officer does not know that the defendant is on probation.

3. **Criminal Law § 143— G.S. 15A-1343(b)(15) not extended to include application of exclusionary rule to probation revocation hearing**

G.S. 15A-1343(b)(15), which provides that the "Court may not require as a condition of probation that the probationer submit to any other search [besides one conducted by his probation officer] that would otherwise be unlawful," does not extend to prohibit evidence obtained from an unlawful search from being admitted into evidence at a probation revocation hearing.

4. **Criminal Law § 143.5— prior case excluding evidence in probation revocation hearing overruled**

The Court expressly overruled *State v. McMilliam*, 243 N.C. 775 (1956) and held that evidence which does not meet the standards of the Fourth and Fourteenth Amendments to the United States Constitution *may be admitted in* a probation revocation hearing.

Justice EXUM dissenting.

Justices COPELAND and MARTIN join in this dissent.

WE granted defendant's petition for discretionary review under G.S. 7A-31 (1981) to review the decision of the Court of Appeals, 52 N.C. App. 316, 278 S.E. 2d 318 (1981), that reversed and

remanded the order of *Judge Frank R. Brown* entered at the 11 August 1980 Session of Superior Court, HYDE County.

The main question presented in this appeal is whether the exclusionary rule applies in probation revocation hearings.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Frank P. Graham, for the State.*

*Herman E. Gaskins and Joel Hirschhorn, admitted pro hac vice, for defendant-appellant.*

CARLTON, Justice.

## I.

## A.

In light of our holding below that the exclusionary rule is not applicable in probation revocation hearings, an extensive recitation of the facts in this case is unnecessary. However, in order to address the erroneous reasoning of the Court of Appeals, we summarize the essential facts.

Defendant was convicted of felonious sale and delivery of marijuana, a violation of G.S. 90-95(a)(1), in the Superior Court, Hyde County, on 13 August 1979. He received a five-year prison sentence which was suspended. Defendant was placed on probation. One of the conditions of probation was that defendant not have in his possession or control during the five years of probation any controlled substance as defined in Chapter 90 of the North Carolina General Statutes, unless prescribed by a medical doctor and dispensed by a physician or pharmacist.

Fifteen days later, defendant was arrested at Miami International Airport for possession of marijuana.[1] The circumstances leading up to that arrest are not contested. The stipulated facts are as follows: Officer William Johnson of the Dade County Public Safety Department saw defendant at about 5:00 p.m. standing on the sidewalk outside the National Airlines Terminal at Miami International Airport. Defendant was holding a suitbag and briefcase in one hand and a ticket in the other. He appeared nervous

---

1. Marijuana is a Schedule VI controlled substance under G.S. 90-94, possession of which is prohibited under G.S. 90-95.

and impatient. Defendant then set down his luggage, walked over to a porter and began talking with him. Johnson moved closer, saw that defendant had a baggage claim check, and learned that defendant was en route to New Orleans. Johnson noticed that defendant also had a brown American Tourister suitcase on the sidewalk and overheard the defendant tell the porter he was concerned that this suitcase, which had already been checked for the flight, might not get aboard the plane which was to leave in ten minutes. After showing the porter his ticket and requesting that the suitcase be placed aboard the plane, Johnson watched the defendant carry his briefcase, suitbag and ticket into the terminal. Defendant stopped, set down his luggage and examined his ticket. Johnson thought he saw defendant put the claim check "either down the front of his pants or in his watch pocket." Johnson noted that defendant's jeans "were very tight." Defendant looked around nervously and continued through the airport. At this point, Johnson got another officer, Det. D'Azevedo, to join him. The two officers then followed the defendant toward the boarding area. D'Azevedo displayed his badge to defendant and asked to speak to him. Defendant stopped. D'Azevedo asked defendant to show him his ticket and identification. Defendant appeared pale and sweaty. He gave D'Azevedo his ticket and his Florida driver's license. Defendant's hands shook so violently that he nearly dropped the license. D'Azevedo turned around and began writing down the information. Johnson, still standing behind the defendant, then watched the defendant place his hand, which was trembling violently, into the front of his pants and then, with what appeared to be a claim check in his hand, into the back of his tight-fitting blue jeans. Johnson then moved, grabbed both of defendant's arms and seized his check. Meanwhile, D'Azevedo observed that the name on defendant's ticket did not match the name on his driver's license. At this point, Johnson left to procure the suitcase that went with the claim check he had seized from the defendant. The defendant then asked D'Azevedo, "Am I under arrest, because if I'm not, I'm leaving." D'Azevedo told him he was not free to leave.

The officers obtained the services of the U.S. Customs narcotics detector dog unit. After retrieving the defendant's suitcase, they placed it among three other suitcases randomly selected. A narcotics detector dog then "alerted" to the presence of a narcotic

odor coming from defendant's suitcase. Defendant was informed
of this and placed under arrest for possession of an unknown con-
trolled substance of unknown quantity. About half an hour later
defendant and his luggage were transported to another station.
During this trip Johnson and another officer questioned defendant
about prior arrests and other matters relating to this case,
although neither officer had informed defendant of his constitu-
tional rights. D'Azevedo asked for defendant's consent to search
his briefcase and suitbag; defendant refused to give his consent.
D'Azevedo had another dog at the second station inspect defend-
ant's briefcase and suitbag along with an unrelated briefcase
placed with them. This dog indicated narcotics in both defendant's
briefcase and his suitbag.

A search warrant was obtained for the three pieces of lug-
gage based on the "alerts" by the two U.S. Customs dogs. The
suitcase and briefcase were forced open because defendant would
not give the officers the combinations for the locks. About twenty
grams of marijuana were found in the suitcase; no narcotics were
found in the briefcase or suitbag.

Defendant's probation officer instituted a revocation hearing
in North Carolina based on the Miami arrest. Defendant moved to
suppress any evidence obtained from that arrest on the ground
that it had been unconstitutionally obtained. Defendant's motion
was granted by Judge Brown and the State appealed.

[1] The Court of Appeals reversed and remanded, holding that
Judge Brown erred in treating the matter as a warrantless search
when the record disclosed that the search of defendant's luggage
in Miami was made pursuant to a search warrant. Its reasoning
was then based on the presumption that the search warrant was
valid because it did not appear in the record. The court conclud-
ed: "In the present case, the search warrant does not appear of
record, and the record before us demonstrates that defendant of-
fered no evidence of facts with which to overcome the presump-
tion of regularity of the search warrant or to overcome the
resulting prima facie evidence of the reasonableness of the
search." 52 N.C. App. at 321, 278 S.E. 2d at 321 (1981).

The Court of Appeals' reasoning is erroneous. First, the
court failed to initially determine whether the information used to
obtain the warrant was procured through an unconstitutional

seizure. If the information was so obtained then the warrant and the search conducted under it were illegal and the evidence obtained from them was "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 484-88, 83 S.Ct. 407, 416-17, 9 L.Ed. 2d 441, 453-55 (1963). As such, the evidence would be inadmissible if the exclusionary rule is applied to probation revocation hearings.

Second, a careful reading of the two opinions of this Court cited by the Court of Appeals in support of its application of the presumption of regularity indicates the Court of Appeals misunderstood the presumption. These opinions demonstrate that the presumption is applicable only in situations where the defendant challenges the validity of a search warrant that was not introduced into evidence on the ground that the warrant itself does not conform to *technical statutory requirements. State v. Spillars,* 280 N.C. 341, 350-51, 185 S.E. 2d 881, 887 (1972) (addressing contention that an affidavit must be attached at all times to the search warrant); *State v. Shermer,* 216 N.C. 719, 721, 6 S.E. 2d 529, 530 (1940) (discussing whether an affidavit used to support a warrant must be signed or the attesting person examined). *See also State v. McGowan,* 243 N.C. 431, 433, 90 S.E. 2d 703, 705 (1956) (deciding whether a warrant is defective if it is not signed by one authorized to issue it).

Moreover, the Court of Appeals failed to recognize two other factors that must be examined before the presumption of regularity will apply: the presumption will operate *only* when the facts in the record do not indicate the occurrence of any irregularities and no objection to the validity of the warrant has been raised in a timely fashion. In *State v. McGowan,* this Court explained the operation of the presumption of regularity:

> In this case neither the State nor the defendant introduced the warrant in evidence. If nothing else appears and if no objection to the validity of the warrant had been raised in the Superior Court, we would be justified in presuming the officers of the law performed their legal duties and that the warrant was legal and valid. (Citations omitted.) In this case, however, something else *does* appear and the validity of the warrant *was* challenged in the Superior Court.

243 N.C. at 433, 90 S.E. 2d at 705 (1956) (original emphasis).

In the case at bar the record plainly discloses that defendant made a timely objection to the validity of the warrant when defense counsel filed a motion to suppress the evidence obtained under the warrant on the basis of the seizure of defendant at the airport. Indeed, the thrust of defendant's arguments before this Court and the Court of Appeals has been directed to the constitutionality of that initial seizure—the threshold issue the Court of Appeals failed to address—and the applicability of the "fruit of the poisonous tree" doctrine. Moreover, the uncontroverted facts to which both parties stipulated plainly raise the question of the validity of defendant's initial seizure at the airport. Hence, the Court of Appeals erred in relying on the presumption of regularity of search warrants not introduced into evidence.

## II.

### A.

As noted above, defendant's primary contention from the outset has been that he was unconstitutionally seized in the Miami airport in violation of the fourth and fourteenth amendments. He relies primarily on *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed. 2d 890 (1980). Judge Brown agreed that the seizure was unconstitutional and allowed the motion to suppress. It is unnecessary for us to address the constitutionality of defendant's seizure and the resulting search because we hold, as discussed below, that the exclusionary rule is not applicable in probation revocation hearings.

### B.

[2]  In deciding whether the exclusionary rule should be applied in probation revocation hearings, we must keep in mind its purpose. In *United States v. Calandra* the United States Supreme Court stated that the "prime purpose" of the exclusionary rule is "to deter future unlawful police conduct" by removing the incentive to disregard the fourth amendment. 414 U.S. 338, 347, 94 S.Ct. 613, 619-20, 38 L.Ed. 2d 561, 571 (1974). Its purpose is "not to redress the injury . . . ." *Id.*

The deterrent effect of the exclusionary rule is based on the assumption that a police officer realizes that his duty is to conduct searches and seizures only in a manner that will help secure a *conviction.* The officer knows that the prosecution can obtain a

conviction only if the evidence he acquires is admissible at *trial.* The exclusionary rule deters police misconduct because the enforcement officer knows that if he violates a defendant's constitutional rights the evidence he obtains in so doing will not be admissible at trial. If the evidence is not admissible (and the prosecution has nothing else upon which to base its case), the defendant cannot be convicted. In effect, the officer's search or seizure has been a waste of time.[2]

Because the exclusionary rule is built on the notion that evidence derived from searches and seizures is oftentimes the foundation upon which a conviction will rest and the strength of the state's case will be measured by the caliber of such evidence admissible at *trial,* extending the application of the exclusionary rule to *probation revocation hearings* will add nothing to its deterrent effect. To hold otherwise would be to erroneously assume that an officer would approach any given search or seizure as if the suspect was on probation, an unrealistic assumption at best. The foregoing is true, of course, so long as the enforcement officer does not know that the defendant is on probation. If the officer knows that the defendant is on probation the officer may not be deterred from conducting an illegal search or seizure of the defendant unless he knows the evidence obtained from such illegal conduct is excluded at a probation revocation hearing.

As we stated in *State v. Hewett,* 270 N.C. 348, 351, 154 S.E. 2d 476, 478 (1967), probation is "an act of grace" accorded one who has been convicted of crime. The "defendant carries the keys to his freedom in his willingness to comply with the court's sentence." *Id.* at 353, 154 S.E. 2d at 479. In the case at bar, fifteen days after he was convicted of felonious sale and delivery of marijuana, officers found that same drug in defendant's possession in violation of his probation. While the exclusionary rule may well apply in defendant's trial in Florida, we hold that it will not apply in his North Carolina probation revocation hearing. To apply the rule in such cases would severely damage our probation system by allowing those like Lombardo, who show a total

2. We note that if a police officer conducts unconstitutional searches or seizures merely to harass, he will do so without regard to whether the exclusionary rule applies.

disregard for the system, to exclude evidence of their personal probation violations.

### C.

[3]  Defendant also argues that the North Carolina statute that governs the terms which may be imposed as a condition of probation should be extended judicially to include application of the exclusionary rule to probation revocation hearings. G.S. § 15A-1343(b)(15) (Cum. Supp. 1981) provides that "[t]he Court may not require as a condition of probation that the probationer submit to any other search [besides one conducted by his probation officer] that would otherwise be unlawful." Defendant contends that since the court cannot require, as a condition of probation, that the probationer submit to unlawful searches, it also should not be able to admit evidence obtained from an unlawful search to revoke the probation. This argument fails, however, to acknowledge the crucial distinction between the conditions that may be imposed on a probationer and the type of evidence that may be used to prove a violation of those conditions. If, in contravention of G.S. § 15A-1343(b)(15), a court could require a defendant to submit to unlawful searches as a condition of his probation, then the court, in effect, would have the power to rescind a defendant's fourth amendment rights.[3] Moreover, the mere refusal to submit to such a search would constitute a violation of defendant's probation. That is, without regard to whether a defendant had engaged in any illegal or unacceptable behavior, his probation could be revoked simply because he refused to waive his constitutional rights. This is not the result when we decline to extend the exclusionary rule to probation revocation hearings. In refusing to apply the rule to probation revocation hearings we decide only that given that a defendant's rights were violated by an officer unaware of defendant's status, nevertheless, we will admit the evidence derived from the unconstitutional search or seizure because to exclude it would not further the interest of deterring police misconduct.

### D.

[4]  Defendant correctly cites this Court's decision in *State v. McMilliam*, 243 N.C. 775, 92 S.E. 2d 205 (1956) [hereinafter cited

---

3. We do not discuss here the propriety of such actions.

State v. Lombardo

as *McMilliam II*], for the proposition that evidence obtained under an unlawful search warrant or without a search warrant must be excluded in a probation revocation hearing. However, for the reasons stated above, we expressly overrule *McMilliam II* and hold that evidence which does not meet the standards of the fourth and fourteenth amendments to the United States Constitution *may be admitted in a* probation revocation hearing.[4] Although the United States Supreme Court has not yet agreed to address the issue, *Queen v. Arkansas*, 271 Ark. 929, 612 S.W. 2d 95, *cert. denied*, 50 U.S.L.W. 3351 (1981), our determination that the exclusionary rule will not apply in probation revocation hearings is in accord with the overwhelming majority of state courts and federal circuits that have answered the question, 77 A.L.R. 3d 636, 641 (1977); 30 A.L.R. Fed. 824, 827 (1976). Of the sixteen state courts which have addressed the issue, thirteen have held that the exclusionary rule does not apply in probation revocation hearings.[5] Five of the six federal circuit courts that have faced the

4. We note that this Court determined in another case that the evidence in *McMilliam II* was procured in violation of defendant's state constitutional rights, *State v. McMilliam* [companion case to *McMilliam II* hereinafter cited as *McMilliam I*], 243 N.C. 771 (1955). The evidence in *McMilliam I* was excluded at defendant's criminal trial under a statute which provided generally that evidence obtained without a warrant shall be incompetent "in the trial of any action," G.S. 15-27. *McMilliam II*, which we overrule today, judicially extended the reach of G.S. 15-27 by excluding incompetent evidence at probation revocation hearings. Although G.S. 15-27 has been repealed by Act of April 11, 1974, ch. 1286, § 26, 1973 N.C. Sess. Laws 490, 556, this Court must still examine the constitutional basis for application of the exclusionary rule to probation revocation hearings.

5. *Arizona—State v. Towle*, 125 Ariz. 397, 609 P. 2d 1097 (1980) (where police do not know arrestee is a probationer).

*California—People v. Rafter*, 41 Cal. App. 3d 557, 116 Cal. Rptr. 281 (1974); *People v. Hayko*, 7 Cal. App. 3d 604, 86 Cal. Rptr. 726 (1970).

*Colorado—People v. Wilkerson*, 189 Colo. 448, 541 P. 2d 896 (1975) (except where the unreasonable search or seizure is such as to shock the conscience of the court); *People v. Atencio*, 186 Colo. 76, 525 P. 2d 461 (1974).

*Florida—Croteau v. State*, 334 So. 2d 577 (Fla. 1976); *Bernhardt v. State*, 288 So. 2d 490 (Fla. 1974); *Brill v. State*, 159 Fla. 682, 32 So. 2d 607 (1947); *Kinzer v. State*, 366 So. 2d 874 (Fla. Dist. Ct. App. 1979); *Latham v. State*, 360 So. 2d 127 (Fla. Dist. Ct. App. 1978); *Bruno v. State*, 343 So. 2d 1335 (Fla. Dist. Ct. App. 1977), *cert. denied*, 354 So. 2d 986 (Fla. 1977).

The Florida Supreme Court has determined, however, that the Florida Constitution requires that the exclusionary rule be applied in probation revocation hearings. *Grubbs v. State*, 373 So. 2d 905 (1979).

**State v. Lombardo**

question have held similarly;[6] only the fourth circuit has applied the exclusionary rule in probation revocation hearings, *United*

---

*Illinois—People v. Watson*, 69 Ill. App. 3d 497, 387 N.E. 2d 849 (1979) (except where police harassment demonstrated); *People v. Swanks*, 34 Ill. App. 3d 794, 339 N.E. 2d 469 (1975); *People v. Dowery*, 20 Ill. App. 3d 738, 312 N.E. 2d 682 (1974), *aff'd*, 62 Ill. 2d 200, 340 N.E. 2d 529 (1975).

*Indiana—Dulin v. State*, 169 Ind. App. 211, 346 N.E. 2d 746 (1976) (unless evidence illegally seized as part of a continuing plan of police harassment or in a particularly offensive manner).

*Maine—State v. Caron*, 334 A. 2d 495 (Me. 1975).

*Montana—State v. Thorsness*, 165 Mont. 321, 528 P. 2d 692 (1974).

*New Hampshire—Stone v. Shea*, 113 N.H. 174, 304 A. 2d 647 (1973).

*Oregon—State v. Nettles*, 287 Or. 131, 597 P. 2d 1243 (1979); *State v. Ray*, 41 Or. App. 763, 598 P. 2d 1293 (1979).

*Pennsylvania—Commonwealth v. Davis*, 234 Pa. Super. 31, 336 A. 2d 616 (1975).

*Rhode Island—State v. Spratt*, 386 A. 2d 1094 (R.I. 1978).

*Washington—State v. Proctor*, 16 Wash. App. 865, 559 P. 2d 1363 (1977) (unless police act in bad faith); *State v. Simms*, 10 Wash. App. 75, 516 P. 2d 1088 (1973); *State v. Kuhn*, 7 Wash. App. 190, 499 P. 2d 49, *aff'd on other grounds*, 81 Wash. 2d 648, 503 P. 2d 1061 (1972).

Apparently, the only states which hold that the exclusionary rule should apply in probation revocation hearings are Georgia, Oklahoma and Texas:

*Georgia—Adams v. State*, 153 Ga. App. 41, 264 S.E. 2d 532 (1980); *Giles v. State*, 149 Ga. App. 263, 254 S.E. 2d 154 (1979); *Amiss v. State*, 135 Ga. App. 784, 219 S.E. 2d 28 (1975); *Cooper v. State*, 118 Ga. App. 57, 162 S.E. 2d 753 (1968).

*Oklahoma—Michaud v. State*, 505 P. 2d 1399 (Okla. Crim. App. 1973).

*Texas—Moore v. State*, 562 S.W. 2d 484 (Tex. Crim. App. 1978); *Rushing v. State*, 500 S.W. 2d 667 (Tex. Crim. App. 1973).

Although the Court of Appeals of New York has not expressly addressed the applicability of the exclusionary rule in probation revocation hearings, it has held that a motion to suppress evidence illegally seized should be granted in a probation revocation hearing where two probation officers and a police officer aware of defendant's status conducted the illegal search. *People v. Jackson*, 46 N.Y. 2d 171, 385 N.E. 2d 621, 412 N.Y.S. 2d 884 (1978).

6. The fifth, sixth, seventh and ninth circuits have all held that the exclusionary rule does not apply in probation revocation hearings. The second circuit held that the rule is not applicable in parole revocation proceedings. *United States v. Wiygul*, 578 F. 2d 577, 578 (5th Cir. 1978) (absent a demonstration of police harassment); *United States v. Vandemark*, 522 F. 2d 1019, 1020 (9th Cir. 1975); *United States v. Winsett*, 518 F. 2d 51 (9th Cir. 1975); *United States v. Farmer*, 512

*States v. Workman,* 585 F. 2d 1205 (4th Cir. 1978). We note, however, that in *Workman* the officers conducting the search were the defendant's probation officer and an Alcohol Beverage Control agent who presumably knew the defendant was on probation. The facts in that case are clearly distinguishable, therefore, from the situation existing when defendant Lombardo was seized and searched at the Miami International Airport; that is, the police officers who searched Lombardo and his belongings were not aware of his status as a probationer when the search was conducted. Because the officers conducted their seizure and search of defendant as a preliminary step to a desired *conviction* of defendant in the Florida courts, their conduct was not the sort that application of the exclusionary rule to probation revocation hearings would deter.

In overruling *McMilliam II* this jurisdiction joins the mainstream of American legal thought about the issue before us. When *McMilliam II* was decided over twenty-six years ago, the exclusionary rule had not yet been applied on constitutional grounds in state court proceedings.[7] In reaching our decision today, however, this Court has the benefit of over twenty years of experience in dealing with the exclusionary rule, wisdom gathered from many jurisdictions including our own. We feel that our decision to overrule *McMilliam II* is sound in light of this experience, the deterrent purpose of the exclusionary rule, and the viability of the probation system.

For all the reasons articulated above, we hold that the exclusionary rule should not be applied in probation revocation hearings.

The decision of the Court of Appeals is modified and affirmed. This cause is remanded to the Court of Appeals with in-

---

F. 2d 160, 162-63 (6th Cir. 1975); *cert. denied,* 423 U.S. 987, 96 S.Ct. 397, 46 L.Ed. 2d 305; *United States v. Brown,* 488 F. 2d 94, 95 (5th Cir. 1973); *United States v. Hill,* 447 F. 2d 817, 818-19 (7th Cir. 1971); *United States ex rel. Lombardino v. Heyd,* 318 F. Supp. 648, 650-52 (E.D. La. 1970), *aff'd,* 438 F. 2d 1027 (5th Cir. 1971), *cert. denied,* 404 U.S. 880, 92 S.Ct. 195, 30 L.Ed. 2d 160 (1971); *United States ex rel. Sperling v. Fitzpatrick,* 426 F. 2d 1161, 1163-64 (2d Cir. 1970) (exclusionary rule not applicable to parole revocation proceedings).

7. The United States Supreme Court made the fourth amendment exclusionary rule applicable to the states through the fourteenth amendment in 1961 in *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081 (1961).

structions to remand to the trial court for further proceedings consistent with this opinion.

Modified and Affirmed.

Justice EXUM dissenting.

## I.

I cannot agree with the majority's decision to overrule *State v. McMilliam*, 243 N.C. 775, 92 S.E. 2d 205 (1956) (*McMilliam II*), in order to hold that evidence which has been unlawfully seized is no longer incompetent and inadmissible in probation revocation proceedings. The issue before us is not whether *to extend* the exclusionary rule to probation revocation hearings; it is whether to depart from the rule we have had for over twenty-six years that evidence which is the product of an illegal search and seizure may not be used to invoke criminal sanctions against a probationer.

The majority correctly concludes in Part II-D of its opinion that *State v. McMilliam, supra,* holds that evidence unlawfully obtained "must be excluded in a probation revocation proceeding." Because this Court has never overruled its precedent lightly, *State v. Dixon,* 215 N.C. 161, 167, 1 S.E. 2d 521, 524 (1939), the pertinent question is whether there is a sufficiently sound basis for reversing *McMilliam II.* Put another way, the question is "whether the policies which underlie the proposed rule are strong enough to outweigh both the policies which support the existing rule and the disadvantages of making a change." *Walter v. Schaefer, Precedent and Policy,* 34 U. Chi. L. Rev. 3, 12 (1966). It can be demonstrated, when the competing policies are weighed in this matter, that *McMilliam II* should not be overruled.

The majority's reasons for recanting the *McMilliam II* rule are: (1) excluding unlawfully obtained evidence in a probation revocation proceeding does nothing to further deterrence of police misconduct absent knowledge by the police that the individual searched is a probationer; (2) permitting a probationer to assert the exclusionary rule would severely damage the probation system; (3) allowing illegally obtained evidence to be admitted does not contravene the policies of G.S. 15A-1343(b)(15); (4) the weight of authority is against the exclusion of illegally-obtained evidence in a probation revocation hearing; and (5) to overrule

*McMilliam II* is sound in light of experience with the exclusionary rule.

The most significant reason given by the majority for its decision to overrule *McMilliam II* is that to do so will not reduce the exclusionary rule's deterrence of police misconduct, which the Supreme Court in *United States v. Calandra*, 414 U.S. 338, 347 (1974), considered to be the rule's "prime purpose." To me, this argument falls in on itself. For by overruling *McMilliam II* the majority has simply carved out another exception to the exclusionary rule. Any rule, and whatever values the rule is designed to promote, must necessarily be compromised and its effectiveness reduced in direct proportion to the number of exceptions attached to it. As more exceptions are created to a rule's application, the weaker the rule becomes. It makes no sense to say that a probation revocation hearing exception to the exclusionary rule does not reduce the deterrent value of the rule. Inexorably it will.

The question is not whether the deterrent value of the exclusionary rule will be reduced by our overruling *McMilliam II*. The question is whether the benefits of continued application of the exclusionary rule to probation revocation hearings outweigh both the rule's harmful effects and the disadvantages inherent in overruling one of our precedents.

In *Calandra, supra*, the United States Supreme Court was faced with the question whether illegally-seized evidence should be suppressed in grand jury proceedings. The Court analyzed the problem by "weigh[ing] the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in this context." 414 U.S. at 349. In balancing these factors, it determined not to extend the exclusionary rule because to do so "would achieve a speculative and undoubtedly minimal advance in the deterrence of police misconduct at the expense of substantially impeding the role of the grand jury." 414 U.S. at 351-52. Factors it considered significant were that grand juries are not presided over by judges, are not impeded by "evidentiary and procedural restrictions applicable to a criminal trial," and do not "finally adjudicate guilt or innocence." 414 U.S. at 343, 349-50. To extend the rule "would delay and disrupt" proceedings and "[s]uppression hearings would halt the orderly progress of an investigation and might necessitate extended litigation

of issues only tangentially related to the grand jury's primary objective." *Id.* at 349. This is the analysis used by the Fourth Circuit Court of Appeals, relying on *Calandra,* in *United States v. Workman,* 585 F. 2d 1205 (4th Cir. 1978), in which that court concluded that the exclusionary rule should apply in probation revocation proceedings. *But see United States v. Winsett,* 518 F. 2d 51 (9th Cir. 1975) (applied *Calandra* balancing test and concluded that exclusionary rule should not apply in probation revocation proceedings).

Applying the exclusionary rule in probation revocation hearings, unlike the problems foreseen for grand jury proceedings by the Supreme Court in *Calandra,* has few significant harmful effects. In a probation revocation hearing in North Carolina a trial judge presides and routinely culls incompetent evidence. Thus, suppression hearings are handled by the presiding judge without unduly prolonging the proceedings. To apply the rule does not "severely damage" our probation system as the majority asserts; indeed, we have been applying the rule for at least twenty-six years without observable harmful effects. Since *McMilliam II,* the instant case is the first one to reach our appellate courts in which the applicability of the exclusionary rule in probation revocation proceedings has even been raised.

That some guilty individuals will "go free" is admittedly a cost of excluding illegally-obtained evidence. But the cases in which the exclusionary rule is successfully asserted are few indeed and cases dismissed because of it are numerically insignificant. A study conducted by the United States General Accounting Office revealed that the rule has *minimal* impact on federal case outcomes. In only 1.3 percent of federal felony cases studied was evidence excluded as a result of a Fourth Amendment motion. Virtually no cases were dropped because of search and seizure problems — only four-tenths of 1 percent. Comptroller General of the U.S., *Impact of the Exclusionary Rule on Federal Criminal Prosecution,* Rep. No. GGD-79-45 (April 19, 1979); *see generally, Hearings on Exclusionary Rule Legislation Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary* (statement of Prof. William W. Greenhalgh, Chairperson of American Bar Association's Criminal Justice Section's Legislation Comm., on behalf of ABA). As noted, in North Carolina the exclusionary

rule's applicability to probation revocation hearings has been raised in only two appellate cases in twenty-six years.

On the other hand, continued application of the exclusionary rule in probation revocation hearings in our state will have the benefit of desirable simplicity. North Carolina courts have long followed the rule that evidence which is incompetent at trial is also incompetent in probation revocation hearings. *State v. Hewett*, 270 N.C. 348, 154 S.E. 2d 476 (1967) (revocation of probation may not be supported by incompetent hearsay); *State v. Morton*, 252 N.C. 482, 114 S.E. 2d 115 (1960) (must be sufficient competent evidence to support revocation); *State v. Pratt*, 21 N.C. App. 538, 204 S.E. 2d 906 (1974) (hearsay evidence incompetent and insufficient to support revocation). The *McMilliam II* rule is simply another application of the more general proposition.

The majority's holding that evidence will not be excluded "so long as the enforcement officer does not know that the defendant is on probation" unduly complicates the law. How will this rule work? In the instant case there is no evidence that D'Azevedo and Johnson knew or did not know of defendant's probationary status. The majority assumes, because defendant was convicted in North Carolina and seized and searched in Miami's airport, that the officers were not aware of his probationary status. But these officers were on routine duty in the airport, and their work was reviewed by the captain of the Narcotic Investigation Section. It is at least possible, if not probable, that drug enforcement officers in Miami are aware of the status of individuals who have been convicted of drug violations in Eastern Seaboard states, particularly when such individuals, like defendant here, possess a Florida driver's license. Even if there were evidence of the officers' knowledge of defendant's status, the majority gives no hint as to what kind of knowledge would invoke the exclusionary rule. Is mere knowledge that an individual is on probation, without knowledge of the specific conditions of his probation, sufficient? The majority offers little guidance for our trial courts who must administer its new rule.

Overruling *McMilliam II* seriously undercuts the policies behind G.S. 15A-1343(b)(15) which states: "The court may not require as a condition of probation that the probationer submit to any other search that would otherwise be unlawful." I fail to see

the majority's "crucial distinction between the conditions that may be imposed on a probationer and the type of evidence that may be used to prove a violation of these conditions." The broader policy served by this statute is that a probationer's constitutional protection against unlawful searches should be equal to the protection accorded other citizens. But to admit evidence that was obtained through an unlawful search of a probationer achieves the same practical effect as requiring him to submit to it. It renders the protection of the statute meaningless.

Finally, the *McMilliam II* rule protects certain basic principles of our jurisprudence. First, as the Fourth Circuit pointed out in *United States v. Workman, supra*, 585 F. 2d at 1211:.

> [T]he Supreme Court has never exempted from the operation of the exclusionary rule any adjudicative proceeding in which the government offers unconstitutionally seized evidence in direct support of a charge that may subject the victim of a search to imprisonment. Indeed, the Court has observed that standing to invoke the exclusionary rule 'is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on a victim of the search.' *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed. 2d 561 (1974).

Second, excluding unlawfully obtained evidence assures the integrity of the judicial process and promotes the integrity of the executive branch. As stated in *Mapp v. Ohio*, 367 U.S. 643, 659 (1961):

> Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead v. United States*, 277 US 438, 485 (1928): 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. . . . If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.'

Who is in more need than the probationer of the example the government sets by refusing to use the illegal actions of its

agents to exact a penalty? The government, assisted by the judiciary, does little to further the goal of probation — defendant's rehabilitation — when it allows illegal means to be used to prove he has violated a condition of probation.

In conclusion, I believe we should refuse to overrule *McMilliam II* even though it may be against the weight of authority from other jurisdictions. The better-reasoned approach, and the one which should be more meaningful to us, is that taken by our own Fourth Circuit Court of Appeals in *United States v. Workman, supra,* 585 F. 2d 1205. I see little to be gained by abolishing the exclusionary rule in probation revocation proceedings and much to be lost. We are no wiser than the Court which decided *McMilliam II,* authored by Justice, later Chief Justice, Parker. The case is not clearly wrong. Indeed, to me, it is clearly right. It should remain the law in North Carolina.

## II.

Because I believe unlawfully obtained evidence must be excluded in defendant's probation revocation proceeding, I reach the second question raised by defendant. This question is whether his claim check was taken by law enforcement officers in the Miami airport in violation of his constitutional protection against unreasonable searches and seizures, thus tainting the subsequent identification of his luggage and evidence upon which the search warrant was based and in turn tainting the evidence seized during the subsequent search of his suitcase.

The Fourth Amendment of the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause." This guarantee is applicable to the states. *Mapp v. Ohio, supra,* 367 U.S. 643. The question is at what point a non-border stop of a traveler at an airport by law enforcement personnel triggers the protection of the Fourth Amendment. The Fifth Circuit, sitting *en banc,* recently attempted to synthesize United States Supreme Court decisions on search and seizure and their own precedent in the context of the "stops, interrogations, and searches of suspected drug smugglers by law enforcement officers at airports." *United States v. Berry,* 670 F. 2d 583, 588 (5th Cir. 1982). In a scholarly opinion by Judge Frank

M. Johnson, Jr., the Court developed a useful analytical framework for assessing the constitutionality of law enforcement activity in airports. The Court relied on *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, in rejecting the argument by the defendants that any interrogation police initiate *at an airport* must be held an impermissible seizure unless it is based on reasonable suspicion. *United States v. Berry, supra,* 670 F. 2d at 590-91. In *Terry*, the Supreme Court balanced the government's interest in effective police investigative techniques against the individual's interest in personal security. 392 U.S. at 20-27. It concluded that a police officer with reasonable grounds to believe

> that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or other's safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30-31. Subsequent cases have affirmed the proposition that an officer may make a brief investigatory stop, if not done too intrusively, when he has a reasonable suspicion that an individual is involved in criminal activity. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *Adams v. Williams*, 407 U.S. 143 (1972).

The Court of Appeals in *Berry* also noted that the Supreme Court has not considered all contact between police and private citizens as being within the scope of the Fourth Amendment. For example, in *Terry v. Ohio*, 392 U.S. at 19 n. 16, the Court stated, "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *See also Sibron v. New York*, 392 U.S. 40, 63 (1968). *Cf. Schneckcloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (voluntariness of consent to a search at issue).

Thus, the *Berry* court concluded, 670 F. 2d at 591, that Supreme Court cases have carved "three tiers of police-citizen encounters: communication between police and citizens involving *no* coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause." As illustrated in *Terry v. Ohio, supra,* and our own opinion in *State v. Rinck,* 303 N.C. 551, 280 S.E. 2d 912 (1981), a contact between a police officer and a citizen may be initiated on a reasonable, articulable suspicion of criminal activity and then develop into an arrest supported by probable cause.

The "seizure" referred to in *Berry* has sometimes been referred to in our cases as "a brief stop," "investigatory stop," temporary detention "for purposes of investigating," *State v. Douglas,* 51 N.C. App. 594, 596-97, 277 S.E. 2d 467, 468-69 (1981), *aff'd per curiam,* 304 N.C. 713, 285 S.E. 2d 802 (1982), or simply a "stop," *State v. Rinck, supra,* 303 N.C. at 560, 280 S.E. 2d at 920.

Defendant argues that the initial stop by Detective D'Azevedo was unlawful because it was not based on a reasonable suspicion that defendant was involved in criminal activity. However, as the *Berry* Court ably demonstrates, the Supreme Court has never decided whether an initial stop of a citizen in an airport is a seizure which must be supported by reasonable suspicion. 670 F. 2d at 591-94. In *United States v. Mendenhall,* 446 U.S. 544 (1980), the Court considered the question of whether a stop by Drug Enforcement Administration Agents (DEA) of an airline passenger who fit aspects of a "drug courier profile"[1] was a

---

1. A "drug courier profile" is a list prepared by the DEA of characteristics it believes many drug smugglers possess. Apparently, the list of characteristics changes from airport to airport. *United States v. Berry,* 670 F. 2d at 598-99 n. 17. In *Elmore v. United States,* 595 F. 2d 1036, 1039 n. 3 (5th Cir. 1979), *cert. denied,* 447 U.S. 910 (1980), the following list was given of factors which may be found on a profile:

> The seven primary characteristics are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcases; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amounts of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.

seizure. The Court was unable, however, to achieve a majority opinion on whether a seizure occurred. In addition, in *Mendenhall* the defendant was found to have freely consented to accompany the DEA agents to their office and to the search of her person.

In another airport case, *Reid v. Georgia*, 448 U.S. 438 (1980) (per curiam), the Court did not address the issue of whether the defendant had been seized when he was approached by a DEA agent who identified himself as such and asked defendant and another man for their airline ticket stubs and identification. The Court merely decided that the state court decision could not stand in that it held the stop was a lawful "seizure" based on reasonable suspicion because the defendant fit the DEA drug courier profile in a number of respects.

The *Berry* Court examines *Mendenhall* and *Reid* along with *Brown v. Texas*, 443 U.S. 47 (1979) (detention of pedestrian in high crime area), *Delaware v. Prouse*, 440 U.S. 648 (1979) (automobile stop case), and *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (stop of vehicles at border checkpoints). It determined that no case answered the question whether an airport stop is always an impermissible seizure if unsupported by reasonable suspicion or probable cause.[2] It did determine from the precedent, however, that the proper analytic approach to answering the question is by "weighing the intrusion on an individual's Fourth Amendment interest against the government interest." 670 F. 2d at 594.

The Court balanced the "very substantial" governmental interest in ending drug smuggling against the intrusion on an individual's Fourth Amendment privacy interests. *Id.* at 594-595. It concluded "that airport stops of individuals by police, if of extremely restricted scope and conducted in a completely non-coer-

---

The secondary characteristics are (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious call-back telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities.

2. The Supreme Court has granted certiorari to review a case in which a Florida Appellate Court held that a motion to suppress should have been granted because the defendant's consent to search his luggage had been tainted by a previous improper confinement. *Florida v. Royer*, 389 So. 2d 1007 (Fla. Dist. Ct. App. 1980) (rehearing *en banc*), *pet. for review denied*, 397 So. 2d 779 (Fla. 1981), *cert. granted*, --- U.S. ---, 102 S.Ct. 631, 70 L.Ed. 2d 612 (1981).

cive manner, do not invoke the Fourth Amendment." *Id.* at 594. The balance is "extremely delicate" and the difference between "voluntary, unintrusive communication between police and citizens" and "forced interrogation by police that is so intrusive as to be a seizure, regardless of the government interests involved, rests on fine distinctions in the degree of coercion police may use in an airport stop." *Id.* at 595. The test the Court used of when a seizure has occurred is the same suggested by Justice Stewart in *Mendenhall. Id.* A stop is a seizure "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. at 554. If a stop has been deemed a seizure it is constitutional only if based on a reasonable suspicion, 670 F. 2d at 598, or as we have said, "reasonable grounds to believe that criminal activity may be afoot." *State v. Rinck, supra,* 303 N.C. at 559, 280 S.E. 2d at 919. The Supreme Court has held that mere similarity of a defendant with aspects of the DEA drug courier profile does not give rise to a reasonable suspicion because generally the "circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid v. Georgia, supra,* 448 U.S. at 441. The *Berry* Court concluded that the presence of a particular factor on a drug courier profile does not preclude its use if an officer, in light of his experience and the circumstances of the particular case, can demonstrate it supports a reasonable suspicion that an individual is involved in smuggling drugs. 670 F. 2d at 601.

The Court went on to discuss when a seizure may be so intrusive as to be tantamount to an arrest which must be supported by probable cause. It stated that if individuals are required, without their consent, to accompany police to an airport office, it is an arrest which must be supported by probable cause. *Id.* at 601-03. We have said that an arrest occurs when "law enforcement officials interrupt [one's] activities and significantly restrict his freedom of action." *State v. Rinck, supra,* 303 N.C. at 558, 280 S.E. 2d at 919.

On the facts regarding the two defendants in *Berry,* the Court concluded that the initial stop to ask an individual's identification and travel plans, even though motivated by the agent's

suspicion that the individual was a drug smuggler, was not a seizure. When it was determined from that stop that Berry was attempting to hide his true identity, was traveling with a companion, and initially had given a false name to the agents, there was a reasonable suspicion justifying a seizure of him and his companion in light of their earlier nervousness and the officers' knowledge that Berry had the name of a person for whom they had been told to watch. The Court further found that the subsequent decision of Berry and his companion to accompany the agents to their office and to submit to a search was freely given consent under facts not pertinent to the question raised by defendant Lombardo.

Upon the principles enunciated in *Berry*, with which I agree, and the Supreme Court precedents on which it is based, I conclude that the initial stop of defendant by Officer D'Azevedo was a permissible encounter outside the prohibition of the Fourth Amendment. D'Azevedo identified himself and asked defendant to speak with him for a moment. Defendant stopped and D'Azevedo asked for his ticket and identification. Even though D'Azevedo stopped defendant because he says his suspicions were aroused by his nervousness and his actions with his claim check,[3] there is no evidence that the officers conveyed that impression to Lombardo or that his decision to identify himself was the product of coercion.[4] A citizen may choose to cooperate with police requests.

Whether defendant's increased nervousness and the discrepancy in names on his ticket and license gave rise to a reasonable suspicion for a more intrusive investigation constituting a seizure by D'Azevedo need not be decided because there was no justification for Johnson's grabbing defendant from behind and seizing his claim check from him while D'Azevedo was

3. Neither officer indicated that their suspicions were aroused because defendant fit particular factors in a drug courier profile.

4. I must re-emphasize the point stressed in *Berry* that the distinction between "voluntary, unintrusive communication" and "forced interrogation" constituting a seizure is subtle. 670 F. 2d at 595. The record before us shows that defendant produced his driver's license and ticket in response to the question: "May I please see your ID and ticket?" These words are not facially coercive and no other circumstances up to this point are indicative of coercion. Furthermore, D'Azevedo, prior to asking for defendant's identification had requested defendant to stop and had identified himself as a police officer.

writing down defendant's name and license number. Johnson was about ten yards behind defendant. He did not know at that time that there was any discrepancy in the names on the driver's license and the ticket. He did note that defendant appeared to be extremely nervous. His concern for D'Azevedo's safety aroused by defendant putting his claim check into his pocket and continuing to reach deeper into the pocket is unreasonable in light of his previous observation that defendant was wearing very tight jeans. If defendant's jeans were indeed very tight, then the presence of a weapon would have been apparent before defendant reached into his pocket. Because none was noted by Johnson and because there was no basis for believing at that point that the claim stub was evidence of a crime, I believe he had no justification for grabbing defendant.

Furthermore, Johnson's actions in grabbing defendant, securing him against a ticket counter while advising him he was a police officer and not to struggle was an arrest, *State v. Rinck, supra,* and not merely a temporary detention which may be based on a reasonable suspicion of criminal activity. As an arrest, it must be supported by showing probable cause. There being no probable cause at that time for defendant's arrest, Johnson's subsequent taking of the claim check from defendant and use of it to retrieve defendant's luggage was impermissible, as was his having the luggage sniffed by the U.S. Customs dog.

Thus the search warrant obtained with this information and the marijuana obtained from the search of defendant's luggage were unlawful as being fruits of an illegal arrest. I believe the trial court properly suppressed this evidence of defendant's possession of illegal drugs at his probation revocation hearing.

I believe the decision of the Court of Appeals should be reversed.

Justices COPELAND and MARTIN join in this dissent.